# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

HEATHER SIZEMORE, OBO
C.J., MINOR,
     Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

Case No. 1:13-cv-521
Litkovitz, M.J.

**ORDER**

Plaintiff Heather Sizemore, on behalf of her minor son, C.J., brings this action pursuant to

42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social

Security (Commissioner) denying plaintiff's application for Supplemental Security Income (SSI)

childhood disability benefits. This matter is before the Court on plaintiff's Statement of Errors

(Doc. 9), and the Commissioner's response in opposition (Doc. 19).

## I. Procedural Background

C.J. was born in 2007 and was a preschooler at the time of the administrative law judge

(ALJ)'s decision. Plaintiff filed an application for SSI childhood benefits on C.J.'s behalf in

January 2010, alleging disability due to Pediatric Autoimmune Neuropsychiatric Disorders

Associated with Streptococcal infection (PANDAS), tics, behavioral problems, hyperactivity and

aggression. (Tr. 125).[1] Plaintiff's application was denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a *de novo* hearing before ALJ Kristen King.

Plaintiff and C.J. appeared and testified at the ALJ hearing. On March 23, 2012, the ALJ issued

---

[1] In her Statement of Errors, plaintiff references documents in the Administrative Record by their CM-ECF page numbers. The Court will reference those documents by the transcript page numbers from the Administrative Record.

a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the

Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as

defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon

disability, income, and other financial resources. *Id.*; 20 C.F.R. § 416.202. An individual

under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining

whether a child is disabled for purposes of children's SSI benefits:

1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments?
If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the
Listing of Impairments, Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P, 20 C.F.R. §
416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).

If an impairment does not meet a listed impairment, disability may nonetheless be

established if the child's impairment is medically or functionally equivalent to a listed

2

impairment. A child's impairment is "medically equivalent" to a listed impairment if it is "at

least equal in severity and duration to the criteria" of a listed impairment. 20 C.F.R. § 416.926.

In determining whether a child's impairment(s) functionally equals the listings, the

adjudicator must assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the listings, an

impairment must result in "marked" limitations in two domains of functioning or an "extreme"

limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered

in making this evaluation are (1) how well the child initiates and sustains activities, how much

extra help he needs, and the effects of structured or supportive settings; (2) how the child

functions in school; and (3) the effects of the child's medications or other treatment. 20

C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with

[the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than

extreme." *Id.* An "extreme" limitation exists when the impairment "interferes very seriously

with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

3

416.926a(e)(3)(i). Day-to-day functioning may be "very seriously limited" when only one activity is limited by the impairment or when several activities are limited by the impairment's cumulative effects. *Id.*

If the child's impairment meets, medically equals, or functionally equals an impairment in the listings, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

**B.  The ALJ's findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. [C.J.] was born [in] . . . 2007. Therefore, he was an older infant on January 13, 2010, the date [the] application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).
>
> 2. [C.J.] has not engaged in substantial gainful activity since January 13, 2010, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).
>
> 3. [C.J.] has the following severe impairments: Pediatric Autoimmune Neuropsychiatric Disorder Associated with Streptococcal infection (PANDAS); oppositional defiant disorder,[2] featuring an explosive disorder; attention deficit hyperactivity disorder; and an anxiety disorder (20 CFR 416.924(c)).
>
> 4. [C.J.] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

---

[2] "Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least six months and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, deliberately doing things that will annoy other people, blaming others for his own mistakes or misbehavior, being touchy or easily annoyed by others, being angry and resentful, or being spiteful or vindictive. The behaviors must occur more frequently than is typically observed in individuals of comparable age and developmental level and lead to significant impairment in social, academic, or occupational functioning. In a significant proportion of cases this disorder is a developmental antecedent to Conduct Disorder." *Goodman ex rel. Chambers v. Barnhart*, 247 F. Supp.2d 1249, 1251 n. 4 (N.D. Ala. 2003) (citing American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (4th ed.)).

4

5. [C.J.] does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. [C.J.] has not been disabled, as defined in the Social Security Act, since January 13, 2010, the date the application was filed (20 CFR 416.924(a)).

(Tr. 15-26).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

5

*See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Evidence before the ALJ

The following evidence was submitted to the ALJ before she issued her decision.

### 1. Medical Records

On January 4, 2010, C.J. was taken to the emergency department at Cincinnati Children's Hospital Medical Center (CHMC) due to the development over the preceding two weeks of increasingly dramatic multiple and rapid facial, eye and upper body movements, as well as increasingly aggressive and disruptive behavior. (Tr. 278). Upon presentation, it was noted that C.J.'s eyes were moving rapidly back and forth with rapid blinking consistent with a possible new-onset movement disorder or partial seizure disorder. (*Id.*, Tr. 280). C.J. was prescribed Clonidine and was discharged with instructions to follow up with the Movement Disorder Clinic at CHMC as soon as possible. (Tr. 266-82, 312-15).

Consulting neurologist Dr. Steve W. Wu, M.D., evaluated C.J. at the Neurology Clinic at CHMC on January 5, 2010. (Tr. 283-311, 330-32). Plaintiff reported to Dr. Wu that C.J. was having episodic spells characterized by his eyes moving upwards and horizontally, eye blinking, eye squinting, head tilting and throat clearing. She also reported that C.J.'s behavior had become aggressive and hyperactive and he was running away from his parents as well as telling them to "shut up." C.J. was also reportedly having difficulty at daycare due to his behavioral problems. Dr. Wu found that the tics and behavioral symptoms could be due to past

6

streptococcal infection and he performed a strep titer and throat culture in addition to prescribing Clonidine to help with tics, behavioral changes, and sleep problems.

On January 11, 2010, Dr. Wu spoke with plaintiff and informed her that C.J.'s DNAse B titer was slightly elevated. Given C.J.'s history and laboratory findings, Dr. Wu opined that C.J. may be suffering from Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal infection (PANDAS)[3]. The progress note states that C.J. had not had significant improvement on the initial dose of Clonidine, the dose was to be increased soon, he continued to exhibit aggressive behaviors, his tics were waxing and waning, and he was sleep talking. Dr. Wu told plaintiff to provide an update after increasing C.J.'s dose of Clonidine. (Tr. 282).

When C.J. was seen by Dr. Wu on February 2, 2010, at the CHMC Neurology Clinic for follow up of possible PANDAS, plaintiff reported that the Clonidine was helping to control C.J.'s tics and behavior to some degree, but it made him very sleepy in school and his behavior was worse when he was fatigued; he was still very aggressive and hyperactive; he was sleep talking every night; and he continued to say "shut up" frequently. (Tr. 316). Dr. Wu continued C.J. on Clonidine but advised plaintiff to switch C.J.'s morning dose to noon so he could take a nap afterwards. (Tr. 316-25, 328-32).

On March 30, 2010, plaintiff reported to Dr. Wu on a follow-up visit at the CHMC Movement Disorders Clinic that C.J.'s tics had worsened following an episode of Fifth Disease at the beginning of the month. (Tr. 333-43). The current tics consisted of blinking, squinting,

---

[3]PANDAS is the acronym used "to describe a subset of children who have Obsessive Compulsive Disorder (OCD) and/or tic disorders such as Tourette Syndrome, and in whom symptoms worsen following strep infections such as 'Strep throat' and Scarlet Fever. The children usually have dramatic, 'overnight' onset of symptoms, including motor or vocal tics, obsessions, and/or compulsions. In addition to these symptoms, children may also become moody, irritable or show concerns about separating from parents or loved ones. This abrupt onset is generally preceeded by a Strep throat infection." *See* http://www.nimh.nih.gov/health/publications/pandas/index.shtml (last accessed on September 12, 2014).

tongue movement, and throat clearing. Based on C.J.'s father's reported history of tics since childhood, Dr. Wu found an increased likelihood that C.J. was suffering from a tic disorder rather than PANDAS. Dr. Wu referred C.J. for further strep titers and increased his dose of Clonidine to help with tics and "behavioral problems." (Tr. 334).

On April 13, 2010, C.J. was seen for an initial evaluation by Dr. Sonya Oppenheimer, M.D., in the Division of Developmental & Behavioral Pediatrics at CHMC at the request of C.J.'s treating neurologists. At that time, C.J.'s mother and grandmother reported that prior to the end of the past year, C.J. had done very well and was always very well-behaved. Since then, however, he had developed behavioral episodes and tics. Plaintiff reported that he would throw things and "act wild" at school; he could be mean during such episodes, although he was doing better on the medication; he spit and threw up food; and he rolled his tongue in a strange way and stuck it out like a snake. Plaintiff reported that some of these episodes lasted up to two hours and that she had filmed one of them. Plaintiff reported that C.J. had hurt his older sister during his "rages." Plaintiff reported that at times, C.J. could not be touched. Plaintiff also reported that C.J. had some obsessive compulsive disorder (OCD) characteristics, such as an aversion to things on his hands, to certain textures, and to walking outside, and he had an intense fear of bugs. Dr. Oppenheimer noted that during the evaluation C.J. had some periods of staring, which his grandmother reported she had also noted, but otherwise Dr. Oppenheimer stated she had difficulty distinguishing what were normal behavioral issues as opposed to abnormal rage episodes and tic movements. Dr. Oppenheimer asked that a record of C.J.'s episodes be kept and a return visit be scheduled for six weeks. (Tr. 344-57).

8

C.J. was seen for follow-up with Dr. Oppenheimer on September 14, 2010. She reported that C.J. had been seen by Dr. Mark Johnson, M.D., who believed C.J. had Tourette Syndrome and had referred him for an evaluation. She also reported that Dr. Johnson had started C.J. on Prozac and increased his dose of Clonidine, and C.J. seemed to be doing better. Dr. Oppenheimer noted that C.J. was very busy but pleasant, and she noticed an eye blink tic which had recurred. Dr. Oppenheimer reported that she had referred C.J. to Chandra Pester, Psychiatric APN, for overall behavior management; she had ordered a psychological evaluation; she had ordered occupational therapy to help with sensory issues and calming techniques; and she had advised plaintiff to contact Hamilton City schools for placement of C.J. in their Developmental Preschool. (Tr. 531-33).

C.J. was seen for an initial occupational therapy evaluation with Kaitlin Rooney, OTR/L, under the supervision of Emily Mertz, OTR/L, at the CHMC Liberty Campus Division of Occupational Therapy on September 17, 2010. (Tr. 518-26). The occupational therapist reported that she was unable to administer standardized assessments and thoroughly assess all performance skills and client factors due to time limitations and C.J.'s "non-compliant, inappropriate behaviors." (Tr. 518). Based on evaluation results and clinical observations, the following problem areas were reported: C.J. had below age expected emotional regulation and social interaction; below age expected participation and independence in age appropriate activities of daily living; challenges with ideation and coordination of motor tasks which impacts engagement in age appropriate activities and play; challenges with sensory modulation including over-responsiveness to sensory inputs and seeking inputs, which impacts participation in typical activities; sensory processing difficulties limiting the ability to engage in typical roles and

9

activities, the ability to utilize appropriate coping mechanisms and the ability to accurately attend to tasks; and decreased safety awareness. (Tr. 519). According to plaintiff and C.J.'s father, C.J. constantly chewed his fingernails and skin, picked his nose, sucked his thumb while touching his right chest, and mouthed his hands and inedible objects. They expressed concern that C.J. hit others, bit others, used a screeching voice, ran away without safety awareness, complained his toes were not moving when he wore closed toe shoes, had occasional repetitive vocalizations, and made baby noises with increased excitement. They also reported concern with his increased arousal. They further stated that he had difficulty sleeping through the night with frequent awakenings and insisted upon sleeping with someone else due to fear of monsters. C.J. was reportedly able to get along with his peers and play with his sister, but he had "behaviors" and preferred to play by himself. (Tr. 522). Based on the parents' report, it was determined that C.J. demonstrated over-responsiveness to tactile input as he disliked hair brushing, tooth brushing, messy hands, closed toe shoes, and walking barefoot, and he touched other people and objects which might be a calming strategy to his over-responsiveness. During the session, C.J. appeared over-responsive to vestibular input; he demonstrated difficulties processing proprioceptive input; and he appeared to have some difficulties processing oral input. Further, during the evaluation, C.J. hit the therapist, threw objects, refused to complete tasks, and refused to follow the therapist's instructions. Overall, he interacted inappropriately with the therapist. It was recommended that C.J. participate in frequent occupational therapy to attain independence in occupational performance.

Dr. Donald L. Gilbert, M.D., a neurologist at the Neurology/Movement Disorder and Tourette Syndrome Clinic at CHMC, saw C.J. on referral on September 24, 2010. (Tr. 513-17).

After observing C.J. and speaking with his parents, Dr. Gilbert found that C.J. was more impulsive than an average three-year old with below normal communication and speech articulation as well as significant hyperactivity, but he was re-directable when attention was paid to him.   Dr. Gilbert reported that he had learned through conversations with C.J.'s parents that there were a number of psychosocial stressors in their lives, including marriage problems, living with C.J.'s grandparent, and differing ideas about parenting and discipline.   He reported that "Mom seemed pretty overwhelmed" by C.J. and had come to inaccurately believe that certain behaviors and vocalizations were tics, when in fact most of them were not.   (Tr. 516).   Dr. Gilbert opined that plaintiff "really seemed not to have any methods for redirection of his behavior at her disposal and my strong impression is that she has over medical-ized and over biologized a lot of behavior that is common in impulsive and aggressive toddlers who have no had consistent parenting and discipline." (Tr. 516).   Dr. Gilbert's assessment of C.J. was "Impulsive child with a few tics." (*Id.*).   He opined that most of the concerning behaviors were not tics and that "multiple psychosocial stressors" and many factors were coming together that led to "challenging behaviors and difficulty coping with [C.J.'s] behavior." (Tr. 516-17).   Dr. Gilbert opined that the most important interventions required were parent training and he recommended that follow-up care be focused on behavior, mental health, language and development rather than neurology.   He also recommended that the parents not be concerned about tics or Tourette Syndrome for at least 12 months because tics were not of relevance at C.J.'s age.

On November 1, 2010, C.J. was seen by psychiatrist Dr. Johnson in CHMC's Division of Psychiatry for pharmacological management and monitoring of oppositional/defiant disorder, tic

11

disorder, disruptive behavior and anxiety. (Tr. 510-12). Dr. Johnson reported that C.J. was

taking Clonidine and Prozac with "fair improvement" in symptoms. (Tr. 511). Plaintiff

reported that C.J. continued to be aggressive despite taking Clonidine and Prozac, which seemed

to wear off during the day, and he hit their cat and other people. She reported that he had been

out of control in the past in the classroom and that he might get an Individualized Education Plan

(IEP) at school. She also noted that C.J. was still "fixating" on things and continued to bite and

pick his skin. Dr. Johnson observed that during the examination, C.J. did not speak but sat on

the table and sucked his finger while touching his nipple. His mood and affect were both

anxious. Dr. Johnson observed no tics. C.J. displayed a limited capacity for abstract reasoning

during the exam. Dr. Johnson assessed C.J. as "still quite anxious" and increased his dosage of

Prozac while continuing him on his other medications. (*Id.*). Dr. Johnson assigned a GAF

score of 55.[4] (*Id.*).

Chandra Pester, RN, CNS, performed a diagnostic assessment of C.J. on November 10,

2010, in the CHMC Division of Child Psychiatry. (Tr. 502-08). Plaintiff reported that C.J. was

continuing to experience intermittent tantrums lasting from 2 to 20 minutes, during which he

would become aggressive and hit and kick. Ms. Pester noted that although reported to have

excellent language by history, during the visit most of C.J.'s speech was concrete and tangential

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 51-60 are classified under the DSM-IV as having "moderate" symptoms. *Id.* at 32.

and he had frequent echolalia.[5] (Tr. 505). Ms. Pester observed "some unusual sensory seeking behavior he uses for self soothing (plucking and licking his nipple while sucking his fingers)," and C.J. displayed some impulsivity and was intrusive. (Tr. 508). She further noted parenting differences and negative attention seeking. Ms. Pester assessed C.J.'s current GAF as 50.[6] Ms. Pester recommended that C.J. and his family participate in individual and family therapy, parent coaching, and developmental monitoring and support. (Tr. 509).

When seen by Dr. Johnson on January 31, 2011, for pharmacological management and monitoring of Oppositional Defiant Disorder, tic disorder, Disruptive Behavior Disorder, and anxiety, C.J. was taking Clonidine with "fair improvement" in symptoms but was no longer taking Prozac due to negative side effects. (Tr. 500). C.J. continued to be violent and aggressive at school and at home. Plaintiff also reported that his finger chewing was worse and there was an incident where he pulled a knife out and threatened to cut the dog. (Id.). Dr. Johnson noted that C.J.'s mood and affect were anxious, he displayed a fair level of attention and concentration, and Dr. Johnson observed a "tic" in that C.J. bit his fingernails during the examination. C.J. displayed a limited capacity for abstract reasoning. Dr. Johnson assessed C.J. as still anxious and aggressive at times, assigned him a GAF score of 45, added Celexa to his medications, and increased his dose of Clonidine. (Tr. 499-501).

On February 8, 2011, Dr. Jannel Phillips, Ph.D., performed a Confidential Diagnostic Interview of C.J. after he was referred for a psychological consultation as part of a multi-factored evaluation through the CHMC Division of Developmental and Behavioral Pediatrics. (Tr.

---

[5] Echolalia is the often pathological repetition of what is said by other people as if echoing them. *See* http://www.merriam-webster.com/dictionary/echolalia.
[6] The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. DSM-IV at 32.

496-98).   The purpose of the report was to establish a baseline of C.J.'s neurocognitive profile, identify areas of strength and relative weakness, and aid in diagnostic impressions and treatment planning.   The information in the report was based on the available medical and school records and information provided by plaintiff during a structured family interview.   Dr. Phillips reported that C.J. was a three-year old with a history of developmental delays and behavioral difficulties. She reported that plaintiff questioned the presence of Asperger's syndrome and that plaintiff was very distressed with C.J.'s behaviors, describing him as "out of control." (Tr. 497).   Plaintiff reported that he frequently jumped on the furniture, jumped on the top bunk, climbed on the furniture, repeated after his sister, and purposefully attempted to aggravate his sister and mother. He had to be picked up from school the prior week for knocking a child over and hitting a child. He had pulled a knife out at home and said he was going to cut the dog's head off.   His behaviors included running from the room.   He played with trains and watched the same movies repeatedly.   Dr. Phillips noted C.J. had seen Dr. Gilbert, who ruled out Tourette Syndrome, and that his tics were transient.   Dr. Phillips reported that C.J. was followed by Dr. Johnson and by Nurse Pester for treatment once a month.   His current medications were Clonidine and Celexa, and he appeared to be worse since starting Celexa one week earlier.   C.J. was to start occupational therapy soon for sensory integration, and he rubbed his nipple, picked his fingers, and chewed his fingers "pretty bad." (Tr. 497).

        C.J. saw occupational therapist Abigail Breck, OTR/L, on February 16, 2011.   (Tr. 492-93).   Plaintiff reported a number of concerns, including C.J. chewed on his fingers, became "hyper in public," ran, threw, and in general was "out of control" and hit children and teachers at preschool.   (Tr. 492).   Ms. Breck reported C.J.'s response to treatment was as follows: C.J.

demonstrated significant difficulty engaging in age appropriate, self-directed play, poor attention to task, and oppositional behavior. He also demonstrated oppositional behavior during the session. He demonstrated sensory seeking behaviors indicative of poor proprioceptive, vestibular and tactile processing abilities. Ms. Breck observed redness and open sores on his hands caused by chewing. Ms. Breck issued a red chewy tube for oral proprioceptive input to replace C.J.'s behavior of chewing his fingers. She recommended that C.J. receive weekly occupational therapy services to address sensory modulation and behavioral deficits.

On February 21, 2011, social worker Monica Vonahlefeld reported in a psychiatric consult note that plaintiff had contacted an occupational therapist and stated that she was "at the end of her rope." (Tr. 447). Plaintiff reported that C.J. had inflicted harm on his seven-year old sister and tried to hurt his sister with a screw. Plaintiff stated that C.J. had been hitting his sister and kicking her in the ribs, and he had pushed her off the couch. Plaintiff reported that when told that what he had done was wrong, C.J. replied, "Do you hear me laughing?" (*Id.*). Plaintiff expressed concern that C.J.'s medication was not working. The social worker discussed the option of bringing C.J. to the emergency department for a psychiatric evaluation, which plaintiff indicated she would discuss with C.J.'s father.

On April 25, 2011, Dr. Phillips completed the psychological evaluation she had initiated in February 2011. (Tr. 721-24). C.J.'s medications at that time included Wellbutrin, Clonidine and Concerta. Dr. Phillips administered a battery of tests. Following testing and evaluation, Dr. Phillips found C.J. to have average intellectual functioning. Plaintiff and C.J.'s teacher each independently completed the Behavior Assessment System for Children-II (BASC-2) as a broad measure of C.J.'s social, emotional, behavioral and adaptive functioning. According to Dr.

15

Phillips, each consistently reported "significant behavioral difficulties across settings including marked aggression, motor activity, and impulsivity," and moderate attention concerns in the classroom and other settings were noted.   (Tr. 723).   Adaptively, however, C.J.'s profile was largely within the average range for his age.   Because C.J. presented with varying psychiatric symptoms including tics and extreme disruptive behaviors across settings in the context of average intellectual functioning, Dr. Phillips found diagnoses of Disruptive Behavior Disorder and Intermittent Explosive Disorder made by Dr. Johnson to be appropriate.   She opined that the etiology of C.J.'s current difficulties was likely a combination of "familial factors (strong family history of ADHD, Anxiety, and oppositional behaviors) and maladaptive caregiver-child interactions" in which C.J. was not responding positively to his parent's current attempts to discipline him.   Dr. Phillips opined that despite his average cognitive skills, C.J. was at "high risk of learning difficulties given his poor socioemotional functioning and behavioral dysregulation."   (Tr. 724).   Dr. Phillips strongly recommended "caregiver support with a behavioral specialist focusing on behavior management as well as behavior programming with preschool setting."   (*Id.*).   Dr. Phillips also opined that C.J. was likely eligible for intervention services through an IEP under the classification of Emotional/Behavioral Impairment, particularly since he had demonstrated significant behavior difficulties at pre-school.   Dr. Phillips opined that C.J.'s disruptive behaviors were "very concerning" and warranted intervention.   (*Id.*).   She noted that although he was very cooperative during the testing session, once he was reunited with plaintiff, he began engaging in significant attention seeking behaviors, such as hitting her.   Dr. Phillips encouraged plaintiff to pursue further treatment to address C.J's problematic behaviors, including aggression toward his mother and sister.   Dr. Phillips strongly

16

recommended psychiatric support from Dr. Johnson and Ms. Pester, and she opined that C.J.'s

mother would be a good candidate for a behavior modification program.    In addition, Dr.

Phillips opined that C.J.'s education team might want to develop a Behavior Intervention Plan.

Dr. Phillips made suggestions for a Behavior Intervention Plan that C.J.'s education team should

consider adapting to address his most problematic concerns.

      When C.J. was seen by Dr. Johnson for medication follow-up on April 25, 2011, plaintiff

reported that C.J. had been doing poorly since his last appointment with outbursts on a fairly

frequent basis and she felt he was having problems with impulsivity and hyperactivity, for which

Dr. Johnson prescribed Concerta.  (Tr. 468-69).  Plaintiff reported that she and C.J.'s father

were getting divorced in June.   She had refused to give C.J. Welbutrin as had been prescribed

because he was "not depressed."  (Tr. 468).  Dr. Johnson continued C.J. on Clonidine.  (Tr.

469).  He assigned C.J. a GAF score of 45.

      At age four, C.J. was admitted to the psychiatric unit of CHMC from August 15 to 23,

2011, after being brought to the emergency department by plaintiff due to worsening aggression.

(Tr. 536-87).  Plaintiff reported that C.J. had tried to hit his sister in the head with a golf club;

his sister and grandmother both had bruises from where C.J. had kicked them; C.J. had been

aggressive toward his peers at daycare; C.J. had been aggressive toward a daycare worker; C.J.

was having difficulty with impulsive behavior characterized by taking off running; and he had

threatened to kill the dog with a knife.  (Tr. 537).   Plaintiff reported that she and C.J.'s father

were to be divorced on August 18, 2011.  (Id.).   During his hospitalization, C.J. was noted to be

hyperactive, distractible and impulsive, and he had trouble participating appropriately in

structured activities due to his disruptive behaviors.   He was not aggressive with staff or peers

17

but was aggressive on several occasions during visits, and although he was able to play cooperatively with peers, he needed supervision during play due to his impulsivity. (Tr. 538). C.J. was given a comprehensive speech and language evaluation, and the results showed he had a severe impairment in his receptive language skills and impaired pragmatic language skills. (*Id.*). It was recommended that he begin speech-language therapy as an outpatient after discharge. (*Id.*). During his hospitalization, he had a decrease in hyperactive and impulsive behavior on medication and an increased ability to attend structured activities, and he was responsive to staff suggestions on managing his anger and aggression more effectively. (*Id.*). His family was "strongly encouraged" to pursue further outpatient services because their next appointment was not until October with Dr. Johnson. (*Id.*). At the time of discharge, it was indicated that C.J. had demonstrated significant improvement in impulse control but remained at risk give his history of impulsivity and his diagnoses of Intermittent Explosive Disorder; Mood Disorder, rule out; and Attention Deficit Hyperactivity Disorder ("ADHD"). (Tr. 538, 536). C.J. was discharged on the medications Focalin and Clonidine with the additional diagnosis of language impairment consisting of severe receptive language disorder and impaired pragmatic language skills. (Tr. 536).

On September 7, 2011, C.J. underwent a diagnostic assessment through St. Joseph Orphanage - CARE Case Management. (Tr. 627-40). Plaintiff reported that C.J. is physically aggressive towards family members and peers. She endorsed symptoms of ADHD, including hyperactivity, being in constant motion, difficulty playing quieting, interrupting others, difficulty focusing, and difficulty completing tasks. During the assessment, C.J. was reportedly difficult to engage and often provided a "yes" answer without giving any thought to the question asked.

18

(Tr. 633). On mental status examination, he was uncooperative; his psychomotor level of activity was "hyper," his impulsivity and hyperactivity were high, his ability to focus was limited, his judgment was poor, and he had little insight. (Tr. 634). Plaintiff indicated that C.J.'s aggression was better managed on medication; however, his current potential for violence was assessed as moderate to high. (Tr. 635). It was noted that plaintiff was in the process of having C.J. tested for qualification for IEP services. (Tr. 637). C.J. was assigned a GAF score of 42 as he was "aggressive towards family members and peers and all relationships are poor." (Tr. 638). C.J.'s strengths included his cognitive abilities and playing well by himself, and it was determined that he had the ability to decrease his aggression, improve his communication skills, and improve his social skills with behavioral health counseling, but in addition to such counseling he needed community psychiatric supportive treatment and pharmacological management services. (Tr. 639, 640). It was noted that C.J. "engaged minimally during the assessment and is likely to continue to struggle in his interactions with others," although the potential for improvement in his relationships and expression of feelings was possible if his family supported the treatment recommendations. (Tr. 640).

On September 13, 2011, plaintiff was seen by Dr. Johnson for pharmacological management and monitoring of his conditions. Plaintiff reported that C.J. was "doing a bit better" on the Focalin, but it seemed to wear off toward the end of the day. (Tr. 604). She also reported that C.J. was hitting his sister and chewing his finger. He had an IEP meeting for preschool at Bridgeport Elementary. Dr. Johnson assessed that C.J. was doing better but his medication was wearing off and he was more anxious. He changed his medication to

long-acting Focalin XR and added Zoloft to C.J.'s medication regime. (Tr. 604-05). Dr.

Johnson assigned C.J. a GAF score of 50.

### 2. Educational Records

A Diagnostic Assessment Form was completed in September 2011 by St. Joseph

Orphanage - CARE Case Management on September 7, 2011, following C.J.'s August 2011

hospitalization at CHMC. (Tr. 632-40). It was reported that C.J. attended preschool at

Bridgeport Elementary, his grades were good, he did not have an IEP but his mother was in the

process of having him tested to see if he qualified for IEP services, he was in regular classes, and

he was aggressive with peers at school. (Tr. 637).

C.J. was assessed for special education services under the Individuals with Disabilities

Education Act in September 2011, pursuant to a request made by plaintiff the prior month. (Tr.

661-64). An Evaluation Team Report (ETR) was prepared. (Tr. 665-70). Connie Bittner,

School Psychologist, individually assessed C.J. (Tr. 665-67). She reported that C.J. had been

attending Lighthouse Christian Learning Center (Lighthouse) since he was 18-months old and

that he began attending Bridgeport Elementary School on September 6, 2011. (Tr. 665). In

formulating her conclusions, Ms. Bittner relied in part on observations of C.J. made by school

psychologist Maureen Resnis, who had observed C.J. at Lighthouse in November and December

2010. (Tr. 668-70). Ms. Resnis reported that C.J. behaved appropriately with his regular

teacher and with another adult who came to the classroom to read a story. (Tr. 670). He

benefited from occasional reminders to follow classroom rules and direction. (*Id*.). His teacher

reported that he displayed some tics which had lessened with medication, he often used a loud

voice and chewed on his fingernails, he demonstrated more behavioral difficulties when two

20

classrooms were combined but responded well to verbal warnings, and he had hit other children

before but was not characterized as violent. (Tr. 668-69). Plaintiff's teacher indicated that his

behavior was not negatively impacting his educational functioning at that time. (Tr. 669).

C.J.'s teacher assessed him as being "on track in all areas." (Tr. 671-72). The school district

did not suspect a disability at that time. (Tr. 670).

Ms. Bittner reported in the ETR that due to ongoing parental concerns regarding C.J.'s

behavior, a one-week trial intervention had been initiated in March 2011. (Tr. 666). C.J. was

"very successful" within the classroom during this time and did not demonstrate any negative or

inappropriate skills or behaviors. (*Id*.). Ms. Bittner reported that an observation and an

interview with C.J.'s preschool teacher occurred in September 2011 after C.J. was hospitalized

and plaintiff requested assistance from the Hamilton City School District. (*Id*.). It was

determined that C.J. appeared to function well within his classroom and demonstrated

"well-developed preacademic skills, motor skills, and expressive communication skills." (Tr.

667). Ms. Bittner noted that while "receptive communication did not appear delayed during the

observation, standardized assessment indicates a significant receptive language delay. [C.J.]

many [sic] need to increase pragmatic communication skills, such as looking at the speaker,

taking turns when talking, etc." (*Id*.). She recommended that C.J. participate in "a play-based

assessment with a special education preschool teacher and a speech therapist to gain additional

information regarding his skills." (*Id*.).

On January 26, 2012, Melania Wartner, Intervention Specialist for Hamilton City

Schools/Bridgeport Elementary, reported that C.J. presented no social-emotional, physical,

cognitive, or language concerns. (Tr. 725). Ms. Wartner reported that C.J. followed all

21

classroom rules and routines "without support or re-direct," he interacted normally with peers, and he transitioned from activities without difficulty, there being only one behavior incident where he would not stop talking to a peer during story time. (*Id.*). Ms. Wartner reported that C.J. exhibited normal cognitive ability and was able to count to fifteen, speak in complete sentences, recognize his name in print, follow three-step directions and participate in non-verbal and verbal turn-taking tasks without assistance. (*Id.*).

### 3. State Agency Psychological Assessments

Consultative examining psychologist Nicole A. Leisgang, Psy.D., evaluated C.J. in connection with his application at age 2 years 10 months and issued a "Psychological Report" on May 5, 2010.[7] (Tr. 358-63). Plaintiff reported to Dr. Leisgang that C.J. had tics and ADHD-behaviors associated with PANDAS. Plaintiff described C.J. as restless, impulsive, easily distracted, easily angered, moody, easily aggressive, and defiant. (Tr. 358). Plaintiff reported that C.J. got along well with his sibling and parents but was aggressive and occasionally defiant. She reported he played adequately with others but was easily angered or aggressive. Dr. Leisgang found that C.J. interacted appropriately but did appear to be somewhat restless. (Tr. 359). She observed no tics, although C.J.'s parents pointed out some behaviors, including head movements, which they identified as tics. (*Id.*). C.J. displayed no other eccentricities of manner. (*Id.*). His language skills were adequate as "approximately [100%] of his comments were intelligible" and his receptive language skills appeared to be adequate. (Tr. 360). His attention and concentration skills appeared to be only marginally adequate as he had to be

---

[7] The ALJ and the parties attribute this evaluation and report to Dr. Katherine A. Myers, Psy.D. However, the report is signed only by Dr. Leisgang, who from the letterhead of the report appears to be an associate of Dr. Myers. (See Tr. 358).

redirected back to the task at hand. He appeared to be of average intelligence. (*Id.*). His clinical presentation and his parents' comments suggested that his judgment was less than age appropriate. (*Id.*). Test data suggested that his intellectual and language skills fall in the average range while his motor skills appeared to be moderately delayed for his age group. (Tr. 360-61). His interpersonal skills and adaptive behaviors appeared to be only mildly delayed for his age, but Dr. Leisgang found that future testing was necessary to determine the stability of these results given C.J.'s young age and history of PANDAS. (Tr. 361). Dr. Leisgang diagnosed C.J. with ADHD, combined type and Tic Disorder (both due to a general medical condition, PANDAS), and she assigned him a GAF score of 51 (moderate symptomatology). (Tr. 362).

Dr. Leisgang concluded that C.J.'s cognitive abilities appeared to fall at an age level that would be considered age appropriate; C.J.'s communication skills appeared to be age appropriate; C.J.'s motor skills appeared to be three-fourths of what would be age appropriate; his social/emotional patterns appeared to fall at a level that would be considered to be three-fourths of what would be age appropriate given that he interacted appropriately with Dr. Leisgang, although his parents described him as aggressive with peers and defiant toward his caretakers; C.J.'s personal/behavioral patterns appeared to be age appropriate; and C.J.'s concentration, persistence, and pace of task completion appeared to be three-fourths of what would be considered to be age appropriate. (*Id.*).

Non-examining state agency physician Dr. John L. Mormol, M.D., and non-examining state agency psychologist Dr. John Waddell, Ph.D., reviewed the record and completed a Childhood Disability Evaluation Form on May 21, 2010. (Tr. 366-71). C.J.'s impairments

were listed as motor tics, aggressive behavior, and ADHD, combined type, due to the general

medical condition of PANDAS. (Tr. 366). Dr. Mormol and Dr. Waddell relied on the findings

of consultative examining psychologist Dr. Leisgang to conclude that C.J. had "less than

marked" or "no limitation" in each of the six regulatory functional domains except health and

well-being, where C.J. was found to have "marked" limitation due to his tics. (Tr. 366-69).

They concluded that C.J.'s condition did not meet, medically equal, or functionally equal a listed

impairment. (Tr. 366). In October, non-examining state agency physician Dr. Malika Haque,

M.D., and non-examining state agency psychologist Dr. Deryck Richardson, Ph.D., adopted the

prior assessment of Drs. Mormon and Waddell with the modification that C.J. had "less than

marked" limitation in the domain of health and physical well-being given that the medical

evidence of record did not indicate any significant problems from motor or vocal tics and C.J.

was on Clonidine for tics. (Tr. 375-80).

### E. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ's decision was not based on substantial

evidence because the Appeals Council refused to remand the case to the ALJ for further

consideration in light of new and material evidence; and (2) the ALJ erred in holding that C.J.'s

impairments did not meet, medically equal, or functionally equal a listed impairment. (Doc. 9).

The Court finds that plaintiff's assignments of errors are more appropriately analyzed in reverse

order, and the Court will therefore address them in that manner.

### 1. The ALJ's finding that C.J.'s mental impairments do not meet or medically equal the listings is not supported by substantial evidence.

Plaintiff argues that contrary to the ALJ's finding that C.J.'s impairments do not meet,

medically equal, or functionally equal a listed impairment, the evidence shows that C.J.'s

impairments meet, medically equal or functionally equal Listing 112.08 for Personality Disorders

and Listing 112.10 for Autistic Disorder and Other Pervasive Developmental Disorders.[8]  (Doc.

33 at 38).

Listing 112.08 describes "Personality Disorders" and sets forth the requisite criteria as

follows:

> 112.08 Personality Disorders: Manifested by pervasive, inflexible, and
> maladaptive personality traits, which are typical of the child's long-term
> functioning and not limited to discrete episodes of illness.
>
> The required level of severity for these disorders is met when the requirements in
> both A and B are satisfied.
>
> A. Deeply ingrained, maladaptive patterns of behavior, associated with one of the
> following:
>
> 1. Seclusiveness or autistic thinking; or
> 2. Pathologically inappropriate suspiciousness or hostility; or
> 3. Oddities of thought, perception, speech, and behavior; or
> 4. Persistent disturbances of mood or affect; or
> 5. Pathological dependence, passivity, or aggressiveness; or
> 6. Intense and unstable interpersonal relationships and impulsive and exploitative
> behavior; or
> 7. Pathological perfectionism and inflexibility;
>
> and
>
> B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at
> least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for
> children (age 3 to attainment of age 18), resulting in at least two of the appropriate
> age-group criteria in paragraph B2 of 112.02.

---

[8] Plaintiff does not develop in the Statement of Errors the argument that C.J.'s mental impairments satisfy Listing
112.10 for Autistic Disorder and Other Pervasive Developmental Disorders.  Rather, plaintiff simply alleges in a
footnote that based on C.J.'s "new diagnosis" of Autism Spectrum Disorder, a finding that his mental impairments
meet this section of the listings is warranted by the record.  (Doc. 9 at 36, n. 10).  Accordingly, the Court will not
consider this argument in conjunction with plaintiff's listings assignment of error.  *See Rice v. Comm'r of Soc. Sec.*,
169 F. App'x 452, 454 (6th Cir. 2006) (a plaintiff's failure to develop an argument in a Statement of Errors
challenging an ALJ's non-disability determination amounts to a waiver of that argument).  *See also McPherson v.
Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some
effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible
argument in the most skeletal way, leaving the court to put flesh on its bones.").

Paragraph B2 of Listing 112.02 sets forth the following criteria for children age 3 to attainment

of age 18:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
> d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ found that C.J.'s impairments do not meet or equal the listings for mental

impairments. (Tr. 15). Plaintiff contends the ALJ's finding is in error because the evidence of

record demonstrates that the required criteria of paragraph 112.08(A)(3),(5) and (6) for

personality disorders are met as well as the criteria of paragraph B2(a) and (b) of 112.02.[9] (Doc.

9 at 32-36). The Commissioner argues that substantial evidence supports the ALJ's finding that

C.J.'s impairments do not meet or medically equal a listing. (Doc. 19 at 4-7). The

Commissioner contends that although the evidence shows that C.J. had behavioral problems,

---

[9] Plaintiff also contends that Paragraph 112.08(A)(1) is met for autistic thinking. However, plaintiff relies only on evidence that post-dates the ALJ's decision for this argument. (Doc. 9 at 34). The Court cannot consider evidence submitted to the Appeals Council following the ALJ's decision to determine whether the ALJ's decision is supported by substantial evidence. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

they were not pervasive and indicative of his long-term functioning.

The Court finds that the ALJ erred by failing to provide a reasoned explanation for her determination that C.J.'s mental impairments do not meet or equal the listings for mental impairments. The ALJ's finding reads as follows:

> The claimant's impairments do not produce functional limitations great enough to meet the criteria of any listing in the 112.00 section of the Listing of Impairments. Moreover, no medical source has stated that the severity of the claimant's impairments medically equals a listed impairment.

(Tr. 15). The ALJ did not go beyond this bare conclusion and provide any explanation for her finding.

The necessity of a reasoned explanation for the ALJ's finding that a claimant does not meet or equal the listings has been emphasized by district courts within the Sixth Circuit. *See Risner v. Comm'r of Soc. Sec.*, No. 1:11-cv-036, 2012 WL 893882 (S.D. Ohio Mar. 15, 2012) (Spiegel, J.); *Layton ex rel. B.O. v. Colvin*, No. 12-12934, 2013 WL 5372798 (E.D. Mich. Sept. 25, 2013). In *Layton*, as in this case, the ALJ simply found that the child applicant did "not have an impairment or combination of impairments that meets or medically equals the listings" without providing "a single sentence of analysis or evidence. . . . Instead, the ALJ immediately moved on to comparing the evidence to the six domains of functional equivalence." *Layton*, No. 12-12934, 2013 WL 5372798, at *8. In finding the ALJ erred, the district court explained:

> A bare conclusion that the claimant did not meet or equal any listing, without even identifying the relevant listings that were considered, does not permit this Court to perform meaningful judicial review. *See* 42 U.S.C. § 405(b)(1) (requiring "a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based"); *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp.2d 846, 858-59 (E.D. Mich. 2012). The ALJ's discussion of the six domains of functional equivalence does not "stand in" for the analysis required to find that the claimant did not meet or equal the listings. *See id.* at 859 n. 6 (discussing case law). The ALJ is required to evaluate and make separate

27

determinations on whether Claimant's impairments meet, medically equal, or functionally equal the listings. *See id*.

*Layton*, No. 12-12934, 2013 WL 5372798, at *8.

In *Risner*, the Court reversed and remanded the case for further proceedings where the ALJ failed to adequately explain the basis for his decision that the claimant's mental impairments did not meet or equal a listing. *Risner*, No. 1:11-cv-036, 2012 WL 893882, at *5. The ALJ in *Risner* made a specific finding that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526)." *Risner*, No. 1:11-cv-36 (Doc. 7-2, Tr. 16). The ALJ in *Risner* gave no explanation whatsoever for this finding and simply continued to the next step of the sequential evaluation process. The *Risner* Court determined that the ALJ in the first instance should "assess whether the evidence put forth shows that Plaintiff meets or equals a Listing[.]" *Risner*, No. 1:11-cv-036, 2012 WL 893882, at *5. *See also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (finding the ALJ erred by failing to analyze the claimant's physical condition in relation to the listed impairments) (cited with approval in *Risner*). Because the ALJ in *Risner* failed "to complete a required step in the five-step analysis," the Court remanded the matter to enable the ALJ "to complete his task." *Risner*, No. 1:11-cv-036, 2012 WL 893882, at *5.

The *Layton* Court, on the other hand, declined to remand the case before it on the ground that remand is not required "if the ALJ's failure to articulate his step three findings is harmless in nature." *Layton*, No. 12-12934, 2013 WL 5372798, at *8 (citing *M.G.*, 861 F. Supp.2d at 859-60; *Reynolds*, 424 F. App'x at 416). The Court found that "[w]here 'concrete factual and medical evidence' is 'apparent in the record' such that a court can discern how the ALJ 'would

28

have' reasoned, the outcome should be affirmed." *Id.* (citing *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656-57 (6th Cir. 2009); *M.G.*, 861 F. Supp.2d at 860).   The Court in *Layton* stressed, however, that caution must be exercised in performing this harmless error review, stating that the reviewing court "will not find the ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision." *Id.* (citing *M.G.*, 861 F. Supp.2d at 860).   Rather, it may be "difficult or impossible to determine whether an error is harmless" in situations where the record contains "conflicting or inconclusive evidence" not resolved by the ALJ or where there is "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." *Id.* (citing *Rabbers*, 582 F.3d at 657-68).   In such a case, the Court cannot speculate as to how the ALJ might have weighed such evidence. *Id.* (citing *M.G.*, 861 F.Supp.2d at 860-61).   In *Layton,* however, the Court found it was apparent after examining the record that the same disability outcome would have resulted had the ALJ expressly compared the evidence to specific listings, and the plaintiff had "not identified any 'conflicting or inconclusive evidence' not resolved by the ALJ or 'evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider.'" *Id.*, at *15 (citing *Rabbers,* 582 F.3d at 654, 657-68).   The Court therefore concluded that "[r]emand for the ALJ's failure to articulate his step three finding 'would be an idle and useless formality'." *Id.*

   Here, as in *Risner* and *Layton*, the ALJ erred at step three of the sequential evaluation process by failing "to articulate [her] reasons for why Plaintiff failed to meet or equal" the listings for mental impairments, and specifically Listing 112.08.   While the ALJ was not required to "spell out the weight he gave to each factor in his step three analysis" (*see Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)), the ALJ was required to provide a reasoned

conclusion for her finding that C.J.'s mental impairments did not meet the listings.   As stated in

*Risner*:

> Requiring a reasoned and explained conclusion is not merely a formalistic
> requirement.   On the contrary, as noted by the Sixth Circuit, it is a necessary
> component for this Court to ascertain whether the ALJ's decision was supported
> by substantial evidence.

*Risner*, No. 1:11-cv-036, 2012 WL 893882, at *5.   It is not for the Court to supply a reasoned

basis for the ALJ's decision.   *See Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut.*

*Auto Ins. Co.*, 463 U.S. 29, 43 (1983).   To the contrary,

> The ALJ should, in the first analysis, assess whether the evidence put forth shows
> that Plaintiff meets or equals a Listing.   Should he determine [he] does not, the
> ALJ must explain his decision with a discussion and analysis of the evidence.

*Risner*, No. 1:11-cv-036, 2012 WL 893882, at *5.

Here, the basis for the ALJ's finding that C.J.'s impairments do not meet or equal the

listings is impossible to discern.   Further, the ALJ's error is not harmless.   In contrast to *Layton*,

the record in the present case is replete with "conflicting and inconclusive evidence" concerning

the cause and severity of C.J.'s symptoms.   In finding that C.J.'s impairments were less severe

than alleged, the ALJ glossed over a number of these conflicts and failed to acknowledge

evidence favorable to a disability determination.   The ALJ portrayed C.J. in a very different light

than the totality of C.J.'s treatment history and the record as a whole cast him.

Specifically, the ALJ found that C.J. impairments were less severe than alleged based on

evidence which included: (1) treatment records which showed an improvement in C.J.'s

condition; and (2) school records which showed the absence of any behavioral or other issues.

(Tr. 17-18).   Although there is evidence that treatment ameliorated some of C.J.'s symptoms, the

ALJ disregarded treatment records which document ongoing problems which required both

medication and various types of therapy. The ALJ notes that after C.J. was started on Clonidine

in January 2010, improved behavior and decreased physical manifestations were reported on

follow-up the next month. (Tr. 17, citing Tr. 316). However, the ALJ ignored ontemporaneous

and subsequent reports that while Clonidine was helping to control C.J.'s tics and behavior to

some extent, the medication made him very sleepy in school, his behavior was worse when he

was fatigued, he was still very aggressive and hyperactive, and he was sleep talking every night.

(Tr. 316-25, 328-32). The following month, plaintiff reported that C.J.'s tics had worsened

following an illness, which led to an increase in the prescribed dose of Clonidine. (Tr. 333-43).

In April 2010, C.J.'s treating neurologists requested that Dr. Oppenheimer evaluate him, and she

asked that a record of C.J.'s behavioral episodes be kept for evaluation purposes. (Tr. 345-46,

353-57). In September 2010, Dr. Oppenheimer referred C.J. to Ms. Pester, a psychiatric nurse,

for overall behavioral management and she ordered a psychology evaluation and occupational

therapy to help C.J. with sensory issues and calming techniques. Dr. Oppenheimer also

suggested that plaintiff contact Hamilton City schools for placement of C.J. in their

Developmental Preschool. (Tr. 531-33). On follow-up with Dr. Johnson in November 2010,

plaintiff reported that C.J.'s aggressive behavior was continuing despite treatment with Prozac

and Clonidine, and Dr. Johnson assessed C.J. as "still quite anxious" at that time. (Tr. 512).

Dr. Johnson noted "fair improvement" in C.J's symptoms and increased his Prozac, which

seemed to be wearing off during the day. (Id.). Ms. Pester noted a number of issues during her

November 2010 evaluation, including some unusual sensory seeking behavior, some impulsivity,

and some intrusiveness, and she recommended that C.J. and his family participate in individual

and family therapy as well as other programs. (Tr. 509). In January 2011, plaintiff reported

31

that C.J. continued to be violent and aggressive at school and at home and she relayed an

incidence of threatened violence against the dog with a knife. Dr. Johnson increased C.J.'s dose

of Clonidine and added Celexa to his medications. (Tr. 499-501). In February 2011, a social

worker discussed the possibility of plaintiff bringing C.J. to the emergency department for a

psychiatric evaluation after plaintiff called stating she was at "the end of her rope" and she was

concerned C.J.'s medications were not working. (Tr. 447). Dr. Phillips opined that C.J.'s

behaviors were "very concerning" and warranted intervention in April 2011. (Tr. 724). C.J.

was admitted to the psychiatric unit at CHMC for over one week in August 2011. (Tr. 536-87).

The ALJ acknowledges that C.J. was hospitalized, but the ALJ notes little from the

hospitalization records other than that with an adjustment in medication his condition improved.

(Tr. 18). The ALJ does not acknowledge in her decision that C.J. was diagnosed with a severe

language impairment at that time; that C.J. remained "at risk" given his history of impulsivity

and his diagnoses of Intermittent Explosive Disorder, possible Mood Disorder, and ADHD; and

his family was strongly encouraged to pursue further outpatient services prior to the next

appointment with Dr. Johnson in October. (Tr. 538). The ALJ also failed to acknowledge the

diagnostic assessment performed by St. Joseph Orphanage - CARE Case Management in

September 2011, at which time the social worker found C.J. to be uncooperative; his

psychomotor activity, impulsivity, and hyperactivity were high; his ability to focus was limited;

his judgment was poor; and he had little insight. (Tr. 634). Viewed as a whole, this evidence

suggests that C.J. suffered ongoing problems which the ALJ failed to discuss in the context of

whether C.J.'s mental impairments met or medically equaled the listings.

In addition, the ALJ relied on preschool records showing a near absence of any behavioral issues to discount the alleged severity of C.J.'s symptoms. The ALJ stated that the preschool records showed that C.J. had no history of suspensions or expulsions, he played well independently, and he obtained good grades (although the ALJ neglected to mention that the same records reported that C.J. was aggressive with peers). (Tr. 18, citing Tr. 637-38). The ALJ also noted that the initial IEP assessment did not disclose behavioral issues on observation, and C.J.'s teacher indicated that his behavior did not negatively influence his functioning; to the contrary, according to the initial IEP assessment, C.J. appeared "well manner [sic], interacted normally, and had no difficulties transitioning." (Tr. 81-19, citing Tr. 645, 628, 634). Further, the ALJ noted that the intervention specialist reported no social-emotional, physical, cognitive or language skills. (Tr. 19). However, the ALJ made no attempt to reconcile this picture of C.J. painted by the school records with the seemingly contradictory picture conveyed by the myriad treatment records as set forth above. Further, the ALJ made no mention of Dr. Phillips' April 25, 2011 report that according to BASC-2 results, both plaintiff and C.J.'s preschool teacher consistently reported "significant behavioral difficulties across settings including marked aggression, motor activity, and impulsivity," and moderate attention concerns in the classroom and other settings were noted. (Tr. 723)

In light of the unexplained conflicts in the evidence, the ALJ's failure to explain her finding that C.J.'s mental impairments did not meet or equal the listings was not harmless error. The record in the present case is replete with "conflicting and inconclusive evidence" which the ALJ failed to resolve. The ALJ's failure to discuss the conflicts in the evidence and acknowledge the evidence favorable to a disability determination in the context of whether C.J.'s

mental impairments met or medically equaled a listing precludes the Court from determining whether the ALJ's finding is supported by substantial evidence. Remand for further proceedings pursuant to Sentence Four is warranted on this ground.

Plaintiff also alleges that the ALJ erred by finding that C.J.'s impairments do not functionally equal the severity of any listed impairment under 112.00 of the listings. (Tr. 16). In light of the Court's above finding, it is not necessary to address whether the ALJ erred by finding that C.J.'s impairments do not functionally equal a listing. As resolution of the issue of whether C.J.'s impairments meet or equal a listing on remand may impact the remainder of the ALJ's sequential evaluation, including her assessment of functional equivalence, it is not necessary to address plaintiff's functional equivalence argument. *See Trent v. Astrue*, No. 1:09cv2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011). In any event, even if plaintiff's argument had merit, the outcome would be the same, *i.e.*, a remand for further proceedings and not an outright reversal for benefits.

Plaintiff's assignment of error related to the ALJ's listings finding is sustained.

**4. A remand pursuant to Sentence Six is warranted.**

Plaintiff alleges that the ALJ erred by failing to consider new and material evidence that was submitted after the ALJ issued her decision and before the Appeals Council rendered its decision. Plaintiff divides the evidence into three categories: (1) medical records which pre-date the ALJ's March 23, 2012 decision, but which were not submitted to the ALJ prior to issuance of her decision (Doc. 9 at 14-16); (2) medical records which post-date the ALJ's decision (*Id*. at 17-20); and (3) school records which post-date the ALJ decision (*Id*. at 20-26).

34

The Commissioner argues that the additional evidence submitted to the Appeals Council after the ALJ issued her decision does not warrant a remand under Sentence Six. (Doc. 19 at 13-18). First, the Commissioner argues that much of the evidence is not "new" because it pre-dates the ALJ hearing and was in existence prior to the date the ALJ issued her decision. Further, the Commissioner argues that even if the evidence is "new," plaintiff has not shown good cause for failing to submit the evidence prior to the date of the ALJ hearing. Finally, as to the new evidence which was not in existence prior to the date the ALJ issued her decision on March 23, 2012, the Commissioner argues that such evidence does not satisfy the requirements for a Sentence Six remand because the evidence is not material.

Evidence that was not before the ALJ cannot be considered when determining whether the ALJ's decision is supported by substantial evidence. *Foster*, 279 F.3d at 357. However, a reviewing court may remand a case for consideration of additional evidence submitted to the Appeals Council if the party seeking remand proves that the additional evidence is new and material, and that the party had good cause for her failure to incorporate the additional evidence into the record during the administrative hearing. 42 U.S.C. § 405(g). Sentence Six of § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" Thus, § 405(g) imposes three requirements for a Sentence Six remand: (1) the evidence must be new; (2) the evidence must be material; and (3) the plaintiff must show good cause exists for her failure to include the evidence in the prior proceeding. *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 549 (6th Cir. 2002). The good cause requirement is

satisfied if there is a "valid reason" for the failure to obtain evidence prior to the hearing. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). The additional evidence is material if there is a "reasonable probability" that the Commissioner "would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health and Human Services*, 865 F.2d 709, 711 (6th Cir. 1988) (citations omitted).

### a. Medical records which pre-date the ALJ's March 23, 2012 decision

Plaintiff seeks a Sentence Six remand for consideration of the following medical records which pre-date the ALJ's decision issued on March 23, 2012, but which plaintiff asserts were not included in the record before the ALJ:

1. 9/10/2010 progress note by Dr. Johnson (Tr. 771)

2. 9/14/10 progress note by Dr. Oppenheimer referring C.J. to Nurse Pester (Tr. 772-73)

3. 9/17/10 Occupational Therapy-General Examination Results (Tr. 779-95)

4. 11/1/10 progress note by Dr. Johnson (Tr. 814)

5. 11/10/10 diagnostic assessment completed by Nurse Pester (Tr. 816-21)

6. 1/31/11 progress note by Dr. Johnson (Tr. 824-25)

7. 2/15/11and 3/2/11 occupational therapy daily notes (Tr. 830-31, 886)

8. 4/25/11 progress note by Dr. Johnson (Tr. 854)

(Doc. 9 at 14-17).[10]

Initially, the Court notes that plaintiff's assertion that none of the above evidence was included in the record before the ALJ is incorrect. In fact, only Dr. Johnson's September 10, 2010 progress note, Dr. Oppenheimer's September 14, 2010 progress note, and the February 15,

---

[10] Plaintiff's counsel asserts this evidence was submitted after the March 23, 2012 ALJ *hearing* date. The ALJ hearing was actually held on January 24, 2012; March 23, 2012 is the date the ALJ issued her decision.

2011 occupational therapy daily note were not before the ALJ at the time she rendered her

decision.   The evidence consisting of the September 17, 2010 occupational therapy results (Tr.

518-26), Nurse Pester's November 10, 2010 diagnostic assessment (Tr. 502-08), the March 2,

2011 occupational therapy daily note (Tr. 483), and Dr. Johnson's progress notes dated

November 1, 2010 (Tr. 511), January 31, 2011 (Tr. 500-01) and April 25, 2011 (Tr. 467-69), was

submitted to the ALJ prior to the date she issued her decision and therefore has been considered

by the Court in connection with its substantial evidence review.

As for the evidence which pre-dates the ALJ's decision but was not submitted to the ALJ,

plaintiff has not shown the requirements for a Sentence Six remand for consideration of these

medical records are satisfied.   First, plaintiff has not demonstrated that the evidence is "new"

given that the records were generated several months before the ALJ issued her decision, and

plaintiff does not allege that the records were unavailable prior to that date.   *See Hollon v.

Comm'r of Soc. Sec.*, 447 F.3d 477, 483-84 (6th Cir. 2006) (evidence is "new" only if it was not

in existence or was not available to the claimant at the time of the administrative proceeding).

In addition, plaintiff has not shown "good cause" for failing to submit the records before the ALJ

issued her decision.   Rather, plaintiff's counsel, who did not represent plaintiff at the ALJ

hearing, only vaguely alleges that "it is suspected that responses to medical record requests to

Children's Hospital may have been returned incomplete."   (Doc. 9 at 14).   Counsel's allegation

falls far short of establishing the required "good cause" for plaintiff's failure to submit medical

records which were apparently available before the ALJ issued her decision.   Remand pursuant

to Sentence Six for consideration of these medical records is not warranted.

37

**b. Medical and school records which post-date the ALJ's decision**

Plaintiff also seeks a Sentence Six remand for consideration of medical and school

records which post-date the ALJ's decision but which were submitted to the Appeals Council for

its review. The medical evidence which falls into this category consists of the following

records:

> 1.　Records of individual therapy with a speech pathologist for the period May 18, 2012 through October 26, 2012 (Tr. 901, 927-38, 1048).

> 2.　A June 29, 2012 progress report by Karen Burkett, CNP, recommending that an ADOS (Autism Diagnostic Observation Schedule) evaluation be performed (Tr. 915).[11]

> 3.　A September 24, 2012 ADOS evaluation undertaken as part of a comprehensive interdisciplinary evaluation due to concerns regarding possible autism spectrum disorder; and an opinion by psychologist Robin Adams, Ph.D., that aspects of C.J.'s presentation appear to be suggestive of an individual with an autism spectrum disorder, advising that additional testing may provide more insight into the nature of C.J.'s difficulties, and advising that the results of the assessment should be considered in combination with other assessments and reported information when making a medical diagnosis (Tr. 937-40).

> 4.　An October 12, 2012 Occupational Therapy-General Evaluation (Tr. 1009-18).

> 5.　An October 24, 2012 diagnostic impression of Disruptive Behavior Disorder NOS and Autism Spectrum Disorder with a GAF of 41-50 provided by Dr. Adams following a comprehensive psychological evaluation (Tr. 1035).

(Doc. 9 at 28-29). The new school records which post-date the ALJ's decision but were

submitted to the Appeals Council for its review consist of the following records:

> 1.　An October 8, 2012 OP-1 Functional Behavior Assessment (Grade K) (Tr. 164-68).

> 2.　A December 12, 2012 ETR by the Hamilton City Schools, including an assessment by school psychologist Maureen Resnis and ratings by C.J.'s teacher (Tr. 215-40).

---

[11] Plaintiff states that C.J. presented to CHMC on July 7, 2012; however, that is the date the progress note was filed.

3.    A 2013-14 Individualized Education Plan (IEP) (Tr. 250-64).

(Doc. 9 at 20-26).   Plaintiff alleges that these records are material because they document that

the "nature and severity of the claimant's odd behaviors, sensory difficulties, and

social/behavioral concerns remained consistent throughout the alleged disability period as

described by C.J.'s parents," and a diagnosis of autism made in September 2012 finally

confirmed suspicions first voiced by his parents as early as 2010 that C.J. suffered from autism.

(Doc. 9 at 28).

The Commissioner contends that the new evidence submitted for the Appeals Council's

review is not material because it is not relevant to the time period at issue, which runs from the

alleged onset date of January 4, 2010, to the date the ALJ issued her decision on March 23, 2012.

(Doc. 19 at 15-16).   To the contrary, the Commissioner asserts that the school records post-date

the ALJ's decision by at least six months and stand in stark contrast to those school records

which were before the ALJ, which the Commissioners alleges are devoid of evidence showing

severe behavioral problems and provide reasonable support for the ALJ's finding of "no marked

limitations" in any of the domains of functioning.   (*Id*. at 16).   The Commissioner further

contends that although C.J. was diagnosed with autism in 2012, treatment records indicate that

"his condition may have deteriorated in 2012," in which case the proper remedy is to file a new

application.   (*Id*. at 17, citing *Sizemore*, 865 F.2d at 712).

The Court finds that a remand is warranted under Sentence Six for consideration of new

evidence submitted into the record which post-dates the ALJ's decision.   The evidence

submitted by plaintiff is material to the time period in issue because there is a "reasonable

39

probability that the Secretary would have reached a different disposition of [plaintiff's] disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

First, the new evidence includes a diagnostic impression of Autism Spectrum Disorder and related findings. The new evidence shows that when C.J. was seen for follow-up of his Disruptive Behavior Disorder, Intermittent Explosive Disorder, anxiety disorder and unspecified tic disorder in June 2012, just three months after the ALJ's decision, plaintiff again raised concerns she had first voiced in 2010 that C.J. was autistic. (Tr. 910-15; Tr. 497). C.J.'s family expressed concern in June 2012 that his repetitive and anxious tendencies were increasing and that he was showing more symptoms of an Autism Spectrum Disorder than he had in the past. (Tr. 915). They reported that other behaviors, such as aggressive behaviors toward family members, had not changed. (Tr. 913). C.J. was referred for both an interdisciplinary evaluation and an ADOS evaluation at that time. (Tr. 915). In September 2012, Elizabeth Gardner, MA, CCC-SLP, performed an ADOS evaluation at CHMC (Tr. 938-43) and concluded that C.J.'s communication and social presentation appeared "to be suggestive of an individual with autism spectrum disorder." (Tr. 940). In October 24, 2012, following a six-hour comprehensive psychology evaluation, licensed psychologist Dr. Robin J. Adams, Ph.D., issued a report which included a diagnostic impression of Autism Spectrum Disorder. (Tr. 1035-41; 1042-47). This evidence is material because the ALJ never considered whether plaintiff's mental impairments met or medically equaled Listing 112.10 for Autistic Disorder and Other Pervasive Developmental Disorders. See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Further, there is a reasonable probability that medical and related information pertaining to an autism diagnosis may have impacted the ALJ's finding as to whether C.J.'s mental

impairments met or medically equaled the Listing for personality disorders. In her decision, the ALJ expressed skepticism as to the source of C.J.'s symptoms. The ALJ appeared to question whether C.J.'s behavioral issues were simply the result of poor parenting, his parents' marital strife, and other stressors in his life as opposed to an actual mental impairment based on the findings of Dr. Gilbert, the neurologist who evaluated C.J. strictly for the presence of Tourette Syndrome and/or a possible tic disorder, and other select portions of the record. (*See* Tr. 18- "Donald L. Gilbert M.D. evaluated the claimant and questioned whether his behavior might actually be the result of multiple psychosocial stressors. . . . Additionally, Dr. Gilbert indicated the claimant's behavior was also a result of inconsistent parenting and discipline."; "In May of 2011 [during a CHMC psychological evaluation] . . . the claimant interacted cooperatively with his evaluator until Ms. Sizemore entered the room, after which he began attention-seeking behavior. . . . Similar to Dr. Gilbert's prior assessment, the evaluator noted that the claimant's *purported* behavioral problems are likely due, in part, to maladaptive caregiver-child interactions." (emphasis added); "Equally, *it is also likely* that the claimant's behavior erodes due to significant social stressors. . . . For example, [in connection with the August 2011 psychiatric hospitalization] most notably . . . Ms. Sizemore indicated that she had initiated a divorce from the claimant's father and obtained a restraining order. . . . Whatever the underlying cause of the claimant [sic] temporarily increased symptomology, with an adjustment in medication, the record indicated an improved condition.") (emphasis added)). The results of the evaluations and testing culminating in the diagnostic impression of autism indicate that there may have been a previously undiagnosed medical basis for C.J.'s symptoms or, at the very least, appear to confirm the reports of behavioral issues in the records that were submitted to the ALJ. There is a reasonable

41

probability this information may have impacted the ALJ's determination as to whether those symptoms met or medically equaled a listed impairment.

Second, the new evidence provides support for plaintiff's consistent allegations concerning C.J.'s symptoms, which the ALJ dismissed in large part because C.J.'s preschool records purportedly demonstrated no difficulties. (*See* Tr. 18-19: "Although Ms. Sizemore portrayed the claimant differently, the claimant attended preschool, obtained good grades, had no history of suspensions or expulsions, and played well independently. . . . In September of 2011, an initial IEP assessment revealed some communication delays, but the claimant appeared well manner [sic], interacted normally, and had no difficulties transitioning. . . . Further, his teacher indicated that his behavior does not negatively influence his functioning."; Tr. 19: stating that in January 2012, an intervention specialist at Hamilton City Schools reported no concerns and there was "no evidence of behavior incidents, let alone at the frequency alleged by Ms. Sizemore."). The educational records submitted to the Appeals Council (Tr. 163-264) document that from the beginning of the kindergarten school year, C.J. demonstrated aggressive and unusual behavior such as previously reported by plaintiff to C.J.'s treating neurologists, psychiatrists and teachers. An intervention was started on September 17, 2012, after C.J. exhibited disruptive school behavior on 15 of 22 days. (Tr. 176). An OP-1 Functional Behavior Assessment (Grade K) was prepared on October 8, 2012 (Tr. 219-22), which addressed inappropriate behavior including inappropriate noises and comments that were disruptive of class instruction and destructive behavior which was occurring three to four times a week. In addition, the records show that C.J. was suspended from school on October 3, 2012, for fighting/violence (hitting another student, running around the room, knocking containers from the shelves in the room, spilling the contents

42

all over) (Tr. 174); he was suspended for unauthorized touching (punching other students while walking around the room) on October 16, 2012 (Tr. 211); and on October 30, 2012, he was subjected to an "emergency removal" from school for posing a "continuing danger to persons or property or an ongoing threat of disrupting the academic process" through uncooperative or insubordinate behavior (making noises, blowing on his hand, banging on his desk, walking around the room, and screaming while in timeout) (Tr. 212). An ETR was prepared in December 2012. (Tr. 223-33). According to the results of C.J.'s teacher's ratings, C.J.'s overall adaptive behavior was in the moderately low range when compared to peers in the same age group. (Tr. 218). In the social-emotional category, "atypicality" was in the "Clinically Significant" range and hyperactivity, aggression, anxiety, withdrawal, attention problems, and adaptability all fell within the "At Risk" range. (Tr. 217). Behaviors which contributed to the elevated score in the area of "atypicality" included "often does strange things and acts strangely; sometimes shows feelings that do not fit the situation and babbles to himself." (Tr. 217). It was determined that C.J. fell in the "Clinically Significant" range because he demonstrated "some immature or odd behavior" which including "playing with his hands or rubbing his nipple as a self-soothing technique." (Tr. 218). Critical items which were noted to be of particular interest and to require specific attention were C.J.'s behaviors of sometimes bullying others, hitting other children and threatening to hurt others and often being easily annoyed by others. (Tr. 217). Based on the results of the ETR, it was determined that C.J. met the state criteria for having a disability or continuing to have a disability and that he required specially designed instruction. (Tr. 239). An IEP was developed in January 2013. (Tr. 250-64). This evidence of C.J.'s behavioral issues appears to be consistent with plaintiff's allegations made in support of

the claim for SSI benefits and, if considered by the ALJ, may have led to a different assessment of plaintiff's credibility. The evidence is therefore material to the disability claim.

Finally, the newly-submitted evidence is material because it bears on the duration of C.J.'s mental impairments and whether he showed sustained improvement. The ALJ found that C.J.'s condition improved with treatment. (Tr. 17- February 2010 follow-up treatment report noted improved behavior and decreased physical manifestations; plaintiff acknowledged significantly improved behavior in March 2010 function report; Tr. 18- records indicated an improved condition with an adjustment in medication following C.J.'s August 2011 psychiatric hospitalization). However, the newly-submitted records indicate that despite periods of temporary improvement in C.J.'s condition during the relevant time frame, symptoms which included aggression, sensory seeking behaviors, and other concerning behaviors persisted. This evidence is material because it bears on whether C.J. suffers from "maladaptive personality traits, which are typical of the child's *long-term* functioning and *not limited to discrete* episodes of illness" and "[d]eeply ingrained, maladaptive patterns of behavior" as required to meet Listing 112.08. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added). Although the Commissioner argues that the new evidence indicates that C.J.'s symptoms may have worsened at the start of the 2012-2013 school year, in which event the proper remedy is not a Sentence Six remand but the submission of a new application for benefits (Doc. 19 at 17), the Court disagrees and finds that the evidence of persistent and worsening symptoms is relevant to the time period at issue because it bears both on the credibility of plaintiff's allegations regarding C.J.'s symptoms and the issue of whether C.J. suffered from the reported symptoms over a sustained period of time.

44

Considering the new evidence as a whole, there is a reasonable probability that the ALJ

would have reached a different disposition of C.J.'s disability claim if presented with the new

evidence, including medical records which produced a diagnostic impression of Autism

Spectrum Disorder and school records which culminated in a determination that C.J. met the

state criteria for having or continuing to have a disability and the formulation of an IEP.   The

ALJ may have gained a better understanding of C.J.'s mental impairments and their

manifestations, and may have credited plaintiff's allegations as to the severity and persistence of

C.J.'s symptoms, in light of this newly-generated evidence.   Accordingly, a remand pursuant to

Sentence Six of 42 U.S.C. § 405(g) for further administrative proceedings in light of the evidence

presented to the Appeals Council is warranted.   Plaintiff's request for a Sentence Six remand is

granted.

## III.  Conclusion

This case involves both a Sentence Four and a Sentence Six remand under § 405(g).

Under Sentence Four of § 405(g), the Court is authorized to enter "a judgment affirming,

modifying, or reversing the decision of the Secretary, with or without remanding the cause for a

rehearing."   Here, a remand under Sentence Four is appropriate because "all of the essential

factual issues have not yet been resolved."   *Newkirk v. Shalala,* 25 F.3d 316, 318 (6th Cir.

1994); *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994).

In a Sentence Six remand, the Court does not rule on the correctness of the administrative

decision as in a Sentence Four determination.   *Faucher,* 17 F.3d at 174 (citing *Melkonyan v.*

*Sullivan,* 501 U.S. 89 (1991)).   Instead:

> [T]he court remands because new evidence has come to light that was not
> available to the claimant at the time of the administrative proceeding and that
> evidence might have changed the outcome of the prior proceeding.   The statute

45

provides that following a sentence six remand, the Secretary must return to the district court to "file with the court any such additional or modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based.

*Melkonyan,* 501 U.S. at 98 (citations omitted).   As discussed above, a Sentence Six remand is warranted to allow for consideration of the evidence submitted by plaintiff to the Appeals Council and the impact on plaintiff's SSI claim.

Where a remand is warranted under both Sentence Four and Sentence Six, the Court may remand under both grounds. As explained by the Eleventh Circuit:

To summarize, after reviewing § 405(g) and the applicable case law, . . . if both sentence-four and sentence-six grounds for remand exist in a disability case, the case may be remanded on both grounds.   District court jurisdiction over the case continues after the entry of the remand judgment as a result of the sentence-six prong of the remand.   If a claimant achieves a remand on both sentence-four and sentence-six grounds, and thereafter succeeds on remand in part due to the sentence-six ground, the claimant may return to district court to request entry of judgment after remand proceedings have been completed.   In such a case, the claimant may wait until the post-remand judgment is entered before filing his EAJA application.

*Jackson v. Chater,* 99 F.3d 1086, 1097-98 (11th Cir. 1996).   Other courts have likewise concluded that "dual basis" remands are appropriate in instances similar to the case at hand pursuant to both Sentence Four and Sentence Six.   *See Banik v. Comm'r of Soc. Sec.,* No. 1:11-cv-342, 2012 WL 2190816, at *17 (S.D. Ohio June 14, 2012), *adopted,* 2012 WL 2890890 (S.D. Ohio July 16, 2012) (collecting cases).   Accordingly, this matter will be reversed and remanded for further proceedings consistent with this decision under Sentence Four of Section 405(g) and under Sentence Six of Section 405(g).

**IT IS THEREFORE ORDERED THAT:**

1. The decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings

pursuant to Sentence Four of 42 U.S.C. § 405(g); and

2. This matter is **REMANDED** pursuant to Sentence Six of 42 U.S.C. § 405(g).


Date: _9/12/14_____                     _Karen L. Litkovitz_____
                                            Karen L. Litkovitz
                                            United States Magistrate Judge

47